Dequindre and Others *v.* Williams.

---◇---

## DEQUINDRE and Others *v.* WILLIAMS.

STATUTE.—*Legislative Interpretation.*—It is not ordinarily the function of the legislature to interpret statutes; nor is such interpretation binding upon the courts as to a past transaction, but as to matters occurring thereafter such legislation guides all the departments of the government.

JURISDICTION.—*Associate Judges.— Guardian and Ward.*—The Associate Judges, as a Court of Probate, had jurisdiction on the 10th of August, 1829, to appoint guardians for infants, and such court was a court of record. It had jurisdiction of guardians' petitions to sell lands. Such jurisdiction extended to lands situated anywhere within the State. Though the law required a bond to be given before entering the order of sale, the failure to require one would not render the proceeding void.

SAME.—*Probate Court.*—The Probate Court, upon its organization under the act of 1829, had authority then to take jurisdiction of matters in relation to guardians and wards then pending in such Court of Probate held by the Associate Judges, and conduct them to conclusion.

SAME.— *Collateral Proceeding.*—Where a proceeding in a court of superior jurisdiction is of such a character that upon final action the court should, from the nature of the case, ascertain whether it is such in fact that it has

jurisdiction to act as it is invoked to do, and it does so act, the matter cannot be questioned collaterally.

SAME.—*Residence of Ward.*—The Associate Judges, as a Court of Probate, on the 10th of August, 1829, appointed a guardian for certain infants.

*Held,* that an inquiry as to whether the infants were at the time of such appointment residents of this or another state, could' not be raised collaterally.

SAME.— *Vendor and Purchaser.— Guardian's Sale.—Application of Proceeds.*— Where a guardian, who has received his appointment from a court of superior jurisdiction having authority to make such appointments and jurisdiction of guardians' petitions to sell lands, but without jurisdiction to make the particular appointment, sells land of his ward, under an order of such court, to one who purchases and pays for such land, relying in good faith on such order, such purchaser will be protected in the title so acquired, if the guardian applies the proceeds properly. And in an action by the late ward, arrived at majority, to recover such land, a debt of the guardian against the deceased father of the ward, through whom the plaintiff claims title, allowed by such court as a credit to the guardian upon settlement, will be presumed to have been rightfully allowed.

INDIAN TREATY.— *Grant.—Relation.*—A section of land, to be located under the direction of the President, was granted to a certain person by an Indian treaty; and after the death of the grantee, the proper court, upon petition of the guardian of the grantee's heirs at law, ordered the sale of the unlocated section; and, the land having been located by the assignee of the purchaser at such guardian's sale, the proper court ordered a conveyance of the specific land to such assignee, which was made, but never approved by the President.

*Held,* that, by the doctrine of relation, the treaty operated instantly in law as a grant, the subsequent location of the land merely ascertaining the specific thing which was granted.

*Held,* also, that the approval of the President was not necessary to the validity of the guardian's deed of conveyance.

SAME.— *Case Stated.*—Suit by the heirs at law of A. against B., to recover certain real estate. Trial upon the following agreed statement of facts: A section of land was granted by treaty with the Potawatamies, of October 16th, 1826, to A., to be located under the direction of the President. It was located, in 1837, in Allen county, without the territory ceded by the Indians under said treaty, the premises in controversy being a part of that section. In 1828, A. died, in Illinois, where he then resided, leaving a widow and children surviving him, who continued to reside in Illinois until 1831, when they removed to Knox county, in this State, prior to which they had no property in Indiana, except the unlocated land. It appeared by the record of certain proceedings in Knox county, that on the 10th of August, 1829, the court doing probate business, held by the Associate Judges, appointed a guardian of A.'s children, the plaintiffs in this action, and that "there being no property," no bond was required. The bond required by law was to be in double the value of the personal property. On the follow-

ing day, the guardian presented his petition to sell the unlocated section, and, after an appraisement at $800, the sale was ordered, the guardian to give bond with sureties approved, within thirty days, but no such bond appeared in the transcript of the proceedings. The sale was to be private, for one-half cash and the balance in two equal annual instalments. In August, 1839, the guardian reported to the Probate Court, that in November, 1831, he had sold the float for $1,000 to one who transferred his right to another, and he to C., who paid the purchase-money and, after having procured the land to be located, died, the report describing the section located. The Probate Court confirmed the sale and directed a conveyance of the specific land to the heirs at law of C. which was accordingly delivered, but was never approved by the President. The title of C. and his heirs afterwards became vested in B., who, with his grantors, paid taxes on the land and took care of and protected it from 1841, though not in actual possession, till the commencement of this action, in 1865. From its location, in 1837, till 1841, it was worth $30 per acre. From January, 1829, till 1840, the United States, it was admitted, held public lands in Knox county and elsewhere, in this State and other states. Upon this evidence the court found for the defendant.

*Held*, that the evidence sustained the finding.

APPEAL from the Allen Circuit Court.

FRAZER, C. J.—This was an action by the appellants, heirs at law of Francois Dequindre, against the appellee, to recover land in Allen county. An issue was made by the general denial, which was submitted for trial upon an agreement as to the facts. There was a finding for the defendant and judgment thereon over a motion for a new trial.

A section of land was granted, by treaty with the Potawatamies, of October 16th, 1826 (7 U. S. Stat. at Large, 295), to Francois Dequindre, to be located under the direction of the President. It was located in 1837, in Allen county, without the territory ceded by the Indians under the treaty; and the premises in controversy are a part of that section. Dequindre died in Illinois, where he then resided, in 1828, leaving a widow and children surviving him, who continued to reside in Illinois until 1831, when they removed to Knox county, in this State, prior to which they had no property in Indiana, except the unlocated land.

It appears by the record of certain proceedings in Knox county, that, on the 10th day of August, 1829, one Broui-

lette was, by a court doing probate business, held by the Associate Judges, appointed guardian of Dequindre's children, who are the present plaintiffs; and it is recited, that "there being no property, no bond is required." The bond required by law was to be in double the value of the personal property, which being nothing, the want of such bond cannot vitiate the appointment. On the following day, the guardian presented his petition, praying authority to sell the unlocated section, which (after an appraisement at eight hundred dollars) was ordered, the guardian to give bond, with sureties approved, within thirty days. No such bond appeared in the transcript of the proceedings. The sale was directed to be at private sale, for one-half cash in hand, the balance in two equal annual instalments.

In August, 1839, the guardian reported to the Probate Court, that, in November, 1831, he had sold the float to John and William Hamilton, for one thousand dollars, whose right they had transferred to another, and he to one McBean, who paid the purchase-money and died; that McBean had procured the land to be located, describing the section located. That court confirmed the sale, and directed a conveyance of the specific land to the heirs at law of McBean, which was accordingly delivered, but was never approved by the President. The title of McBean and his heirs afterwards became vested in the defendant, who, and his grantors, have paid taxes on the land, and taken care of and protected it, since 1841, though never in the actual possession thereof. (This suit was begun in 1865.) From its location, in 1837, until 1841, this land was worth thirty dollars per acre. The United States, it was admitted, held public lands in Knox county and elsewhere, in this State and other states, from January, 1829, until 1840.

We are to determine whether this evidence was sufficient to sustain a verdict for the defendant.

The claim of the plaintiffs was stale, and it is not questioned that the defendant was an honest purchaser, for an

adequate price. These circumstances do not, in this particular case, possess much influence; for the decision must turn, not on questions of fact, but of law. They do, however, seem to class the case amongst those not deemed favorites of the law. Nevertheless, if the title of the plaintiffs has not been divested by the proceedings of the courts of Knox county, already stated, nor their suit barred by any statute of repose, they must recover.

A number of questions have been agitated in the arguments, written and oral, which we have found it not easy to determine to our own satisfaction; and though we have been aided greatly by the industry and learning of able counsel, upon some of them we have not, after the fullest consideration, found ourselves agreeing with entire unanimity.

1. Had the Associate Judges jurisdiction on the 10th of August, 1829, to appoint guardians for infants?

Much of the legislation at that early period of our history as a State was exceedingly obscure and difficult of construction. By the act of 1824 (R. S. 1824, p. 314), the equity side of the circuit court had complete original jurisdiction of the relation of guardian and ward and of all matters relating to the settlement of decedent's estates. By the act of 1825 (Acts 1825, p. 55), the act of 1824 was so amended that the associate judges should be a "court of probate," with "power to hear and determine all matters in relation to the settlement of decedents' estates," which, by the act of 1824, had been vested in the circuit courts, with power to the circuit courts to correct and review their proceedings. It will be seen also, that, by the second section of this act, it was intended to give them jurisdiction to direct the sale of the real estate of decedents to pay debts. To do this business, sessions were to begin on the Mondays preceding the regular terms of the circuit courts.

No express provision was made as to whether any records of this court of probate should be kept, nor that it should have a seal or clerk. Yet those portions of the act

Dequindre and Others *v.* Williams.

of 1824 were left in force which authorized the clerk of the circuit court, in vacation, to take the proof of wills and to grant letters testamentary and of administration (sec. 4), requiring inventories and accounts of sales to be filed in his office (secs. 8, 9); and the practice was universal, so far as we have been able to learn, that the clerk of the circuit court acted as clerk of this probate tribunal and kept its records, as such records had been kept when the equity side of the circuit court exercised the jurisdiction; and it is believed that its process was, in fact, attested by the clerk and seal of the circuit court.

If the question depended wholly upon a construction now to be given to this act of 1825, it would be not only difficult, but, perhaps, impossible, to hold that it conferred authority to appoint guardians. There is nothing in the terms of the act to justify it, and no obscurity in the language employed to call for construction.

The authority given, and the only authority, was, to "hear and determine all matters in relation to the settlement of decedents' estates." But the associate judges did, nevertheless, in some counties, and, it is believed, very generally, assume jurisdiction to appoint guardians for infants, and over the relation of guardian and ward, even to the extent of directing the sale of real estate of wards by their guardians. *Hiestand* v. *Kuns*, 8 Blackf. 347, and *Hunt* v. *White*, 1 Ind. 105, are cases in which such appointments were made, and the validity of them seems to have passed unquestioned. Subsequent legislation repeatedly recognized this jurisdiction as rightfully exercised.

In 1826, it was enacted, "that in the appointment of guardians, &c., it shall not be lawful for the circuit court or court of probate to appoint as guardian, * * the executor or administrator of the estate in which such minor is interested." Acts 1826, p. 55, sec. 23. In March, 1826, the court house of Dearborn county was destroyed by fire, together with the records of the county. In 1827, an act was passed

for the relief of persons likely to suffer by the loss of the records. Acts 1827, p. 53. The sixth section relates to procuring evidence of probate business done, record of which had been destroyed. The eighth section relates, amongst other things, to guardians' bonds destroyed, and provides, that if new bonds be not given within three months, such guardians shall be deemed to have resigned, and that the court of probate shall appoint others, as in cases of resignation or refusal to act.

In 1828, it was provided, that the twenty-third section of the act of 1826, *supra*, should not apply to testamentary guardians, and that such testamentary appointments of guardians should be confirmed by the circuit court or court of probate. Acts 1828, p. 70. The sixth section of this act repealed so much of the act of 1824 as gave original jurisdiction of "probate business" to the circuit courts, except where the title to real estate might be brought in question. On the 19th of December, 1828, an act was passed, appointing a guardian and providing that he should give bond to the satisfaction of the circuit court or court of probate. Acts 1829, p. 57. On the 26th of the same month, it was provided, that where an associate judge was executor or administrator, he should make settlement with the circuit court of his county, a record whereof should be made by that court in the record book of the probate court. *Id.* 56.

It thus appears, most conclusively, that the Associate Judges, sitting as a Court of Probate, under the act of 1825, did exercise jurisdiction to appoint guardians for infants; that the legislature subsequently acted with a knowledge of this fact and, by the strongest implications, recognized it as a lawful authority, and that they deemed it a court of record, and that the clerk of the circuit court was its clerk.

It is not ordinarily the function of the legislature to interpret statutes, nor is such interpretation binding upon the courts as to past transactions. But as to matters oc-

curring thereafter, such legislation guides all departments of the government. Sedgw. on Const. 253. If a legislative construction be even plainly contrary to the terms of the act construed, it must, nevertheless, be taken as a new enactment, changing the old law.

In January, 1829, a new court was created, called the Probate Court, with a single judge, vested with full original jurisdiction over all matters concerning the settlement of decedents' estates, the appointment of guardians, &c. Acts 1829, p. 33. The judge thereof was to be elected at the August election following. This act repealed all others coming within its purview—but it was not to take effect until the first day of August; and it was provided that all "probate business shall continue to be done as it now is," until the judge of the new court should be qualified and ready to act; and all business in the circuit courts, "in any way relating to the settlement of decedents' estates or last wills and testaments" should, it was provided, progress to a final conclusion in the circuit courts. Was this intended to make no provision, during the period between the first of August and the full organization of the new Probate Court (it would be weeks and it might be months), for the transaction of matters relating to decedents' estates, pending in the old Court of Probate, nor for the appointment of administrators and guardians and the transaction of their business?

The attention of the legislature was, it is evident, fixed upon the necessity of making some provision for the transaction of the business to be done by the new court, after the first of August, until the new tribunal should be organized. It accordingly provides for certain pending business then in the circuit courts; and as to all else, it makes only provision for so much as may be comprehended by the phrase "all probate business," a phrase literally signifying, in this connection, perhaps only matters concerning the probate of wills. But we think the words in this instance, as well as

in the act of 1828, where the same words were used, must be deemed to have been used in a wider sense.

Common usage, local perhaps to this State, had adopted the phrase as signifying such business as the court of probate was authorized to transact, and that use of the words has indeed continued until this day—even amongst members of the bar—comprehending all matters concerning the relation of guardian and ward.

In the first section of the act of 1825, already referred to, the same phrase is used in such a connection as clearly to import a meaning much broader than the literal signification of the words.

Inasmuch as the associate judges had done this business, and were then doing it, under legislative approval, it seems plain that it was intended that they should continue in the same manner, until the new court should be provided with officers ready to enter upon duty. The words of the act providing that this business "shall continue to be done as it now is," seem clearly to relate, not only to the officers who shall act, but also to the manner in which they shall proceed and the tribunal in which proceedings shall be conducted. They constitute a proviso or exception to the general words of the repealing clause of the act, and continue previous laws in force, for the time being, and until all the machinery for executing the new law can be provided, to the end that there shall be, during the period subsequent to the first of August and until the judge of the new court shall be commissioned and qualified, a court having jurisdiction to transact this important and necessary business. It would be an unnatural construction of this language to say that it was merely intended that the associate judges should occupy the bench of the new court until its proper judge was qualified to act. That would not be doing the business as the same was previously done, but in a new and, in many respects, a different manner. Besides, such was not, so far as we have been able to inform ourselves, the contemporary understanding of the act. In the case in hand,

which is one instance, the judges purported to hold, not the new Probate Court, but the old Court of Probate. They met in August, as the old court was required to meet, and not in September, the time fixed for the session of the new one. It was so in other counties, and we presume it was so generally. But perhaps the most conclusive evidence of what was understood at the time to be the meaning of this provision is found in an act of the very next session (Acts 1830, p. 47), amending this act, the fifth section of which makes it the duty of the associate judges to hold the new court in such counties as had not elected a probate judge, until one should be elected and qualified. If the same thing had been effected by the act of 1829, this would have been wholly useless. So that contemporaneous exposition, a circumstance of considerable weight after the lapse of forty years, was in harmony with what we deem the natural meaning of the words of the act.

It cannot be doubted that when the legislature enacted that "probate business shall continue to be done as it now is," it had full knowledge of the extent of the jurisdiction which the courts of probate in various counties had, in fact, assumed and were then exercising, to appoint guardians and act upon their applications to sell lands of wards. The language employed would, then, clearly authorize the exercise of this jurisdiction after the first of August, without reference to the question whether its exercise before had been lawful or not.

The foregoing considerations have conducted us to the conclusion that on the 10th of August, 1829, the associate judges, as a court of probate, had jurisdiction to appoint guardians for infants.

2d. The same reasoning leads to the conclusion that it was a court of record.

3d. And that it had jurisdiction of guardians' petitions to sell lands.

4th. But it is urged with great force, that inasmuch as

these plaintiffs were residents of Illinois, no court in Indiana had jurisdiction to appoint a guardian for them.

This proposition is ably combatted by the other side, and it is claimed that the record of the appointment estops inquiry now as to the fact of residence. Numerous cases are cited upon each side of the question. It is the misfortune of American law that the cases are not in entire harmony upon the subject.

Much that has been said by the courts of various states, touching the matter, has had no close relation to the cause in which it was said; and very much of the apparent confusion and conflict of the cases is only apparent. If, in examining the decisions of different states as to the effect of records of courts, we shall ascertain whether the courts whose judgments were under discussion were superior or inferior courts, and if we shall then bear in mind that the law supports the judgments of the former by certain conclusive presumptions, against which neither argument nor proof shall be admitted, and which are not indulged as to the judgments of the latter, much of actual decision that appears to be in conflict will be found readily reconcilable. This, however, can not be said of the great volume of mere *dicta* which pervade the reports.

It has been long settled in this State, that our Probate Court, organized under the act of 1829, was a court of superior jurisdiction. In that particular the prior Court of Probate can not be distinguished from it. Both obviously belonged to the same class.

It cannot be said that the power to appoint guardians is a special power created by statute, and therefore required to be executed strictly according to law that it may be valid. At common law this power existed, belonging to the King, as *parens patriæ*, exercised, however, by the court of chancery, by authority of the sovereign. In this country, it would belong to the legislature, or, if deemed a judicial power, where by any of our state constitutions a division of powers is made and a judicial department created, it would

belong to the courts, to be exercised as in chancery, even in the absence of legislation expressly authorizing it. But, like any other judicial power, it might be regulated by statute. If, then, the legislature chose to require that this authority should be exercised by a court of superior jurisdiction, the validity of the record of such court in a given case of the kind must be tested by the rules ordinarily applicable to its records. This is settled in this State, as to proceedings by administrators for the sale of lands to make assets, thus applying the rule in a case unknown to the common law. And yet it is practically a wise rule and necessary to the repose of titles honestly acquired. Without it, such sales would be made with greater difficulty, and at prices seriously affected by the multiplied dangers of future litigation. It may work injustice in occasional instances, but it is hardly to be doubted that this is more than compensated by its benefits to the whole community.

Now, it is not to be denied that a court of superior jurisdiction may so make a record in a case where, in fact, it has no jurisdiction, that the validity of its judgment cannot be questioned collaterally. But in cases of collateral attack the legal presumption is that this will never be done.

In the matter in hand, the power of the court must have been invoked in some way. It was, and still is, usual in such cases to make an oral application for the appointment of a guardian. It then became the duty of the court to ascertain whether the case was one proper to call for the exercise of its power to appoint. For this purpose, it might hear proof as to residence, as well as concerning the circumstances of the infants. It should have determined these things before making the appointment.

The question of residence is sometimes one of great difficulty, upon the evidence. Suppose such investigation to have been fully made, and an erroneous decision reached, and letters of guardianship thereupon issued. Would it be a salutary rule that every one with whom the guardian might subsequently deal in the performance of his trust might go in-

to the question of residence again, to contest the validity of the appointment?

Must such a question remain forever open? If the highest court in America may be relied on, "the power to hear and determine a cause is jurisdiction." *United States* v. *Arredondo*, 6 Pet. 709. "Any movement by a court is necessarily the exercise of jurisdiction." *The State of Rhode Island* v. *The State of Massachusetts*, 12 Pet. 718.

Here the inquiry as to the residence of the infants was the exercise of jurisdiction. If that question was not correctly decided, it was an erroneous judgment, not a decision which the court had no power to make. The lack of power to determine should not be confounded with error in deciding a question of fact. And yet we are aware that there are numerous instances in which courts of high character, pressed by hard cases, appealing strongly to their sense of justice, have overlooked this distinction, and some in which it has been virtually denied.

We are strongly inclined to the opinion that it is a sound rule, applicable to courts of superior jurisdiction, that when the proceeding is of such a character that, before final action, the court should, from the nature of the case, ascertain whether it is such in fact that it has jurisdiction to act as it is invoked to do, and it does so act, the matter cannot be questioned collaterally. There are numerous cases to this effect. *Shroyer* v. *Richmond*, 16 O. St. 455, is exactly in point. *Cox* v. *Thomas' Adm'x.* 9 Grat. 323; *Grignon's Lessee* v. *Astor*, 2 How. (U. S.) 319; *Prigg* v. *Adams*, 2 Salk. 674; *Doe* v. *Smith*, 1 Ind. 451; *Doe* v. *Litherbery*, 4 McLean, 442. Citations might be greatly extended.

But there is another principle, old as Plowden, and never, we believe, questioned, though perhaps sometimes overlooked, which, it seems to us, is applicable here. The present case shows, in addition to what has been stated, that the purchase-money of the land was applied to the benefit of the plaintiffs, and some of it paid to them after they arrived at full age. The guardian accounted for the

whole, to the satisfaction of the Probate Court. Suspicion is directed only to a single item—a debt of the guardian against the father of the plaintiffs, and through whom they claim title.

It will not do to conclude that this was not an honest demand merely because the guardian was the claimant. The Probate Court allowed this as a credit, and it must be supposed rightfully. If it was a lawful claim, it could have been charged upon the fund or upon the land by administration, and it was therefore to the advantage of the plaintiffs that it be paid without the costs of regular and expensive proceedings to enforce it.

*Graysbrook* v. *Fox*, Plow. 275, was detinue by an executor for personal property, possessed by the testator at his death. Plea, that administration of the goods of the deceased had been committed to one Kene, by virtue whereof Kene sold the property to the defendant for a certain sum in hand paid. The ordinary, it was held, had no power to grant administration, because there was a will appointing an executor. It was held, also, that the plea was bad, but that it would have been good if it had averred that the administrator had employed the money in discharge of the funeral, or of the debts of the deceased, or about other things which an executor should be forced to do. In that case, the sale should not be avoided. It was said, "he that has the right suffers no disadvantage, for it is no more than he was compellable to do, and the act of the administrator shall be allowed good."

In *Coulter's Case*, 5 Co. 30, decided thirty-three years later, substantially the same principle was declared.

It seems, also, from the case in Plowden, that the same point was ruled as early as 4 H. VII., in *Sands* v. *Peckham*.

*Fisher* v. *Bassett*, 9 Leigh, 119, goes still further. An administrator had been appointed by the hustings court in Richmond, when, in truth, that court had no jurisdiction to appoint in the particular case, that belonging in another county, Middlesex. It was held, however, that he was ad-

ministrator *de facto*, and that any payment to him by a debtor of the estate would be good against a subsequent administrator, appointed by the court of the proper county; and that as to the debtor, the appointment was voidable only. This ruling was afterwards approved by the same court in *Cox* v. *Thomas' Adm'x*, 9 Grat. 323. See, also, 1 Williams Ex. 520.

The rule deducible from these cases is, that one who deals in good faith with an administrator that has received his appointment from a tribunal having authority to make such appointments, but without jurisdiction to make the particular appointment, will be protected in payments made or in his title to property thus acquired, if such administrator applies the proceeds properly. The Virginia case goes further. The justice and good sense of this rule commends it to universal approval. It is strongly supported, too, by analogy, as will appear by an examination of the cases cited from Coke and Plowden. It is but adhering to one of the ancient and established landmarks of the law to be guided by it. It must be applicable to the present case. It can make no difference that this is a case of guardianship while those were cases of administration. The reasons for its application are exactly the same in either case. Here we have a purchaser of real estate acting upon the faith of an authority committed by a court of superior jurisdiction, whose money paid for the land has been applied as a guardian properly appointed might lawfully have applied it. The plaintiffs have received the benefit of his money. Why should he not be as fully protected as if the case had been one of administration?

5. The next inquiry seems to be whether the court in Knox county had jurisdiction of the particular application. An argument for the appellant is, that the court of Knox county had no jurisdiction to authorize the sale of lands outside of that county; that the treaty granted the land *in præsenti*; that the location merely ascertained the particular tract previously granted; that, by relation, Dequindre took

title to the section in Allen county from the date of the ratification of the treaty. For the appellee, it is contended that the jurisdiction of the Court of Probate, as to the sale of infants' lands by guardians, was not local, but extended to lands situated anywhere within the State.

The State is divided into counties, and courts are organized and required to hold sessions in each county; but it does not necessarily result therefrom that the jurisdiction of such courts shall be confined either to persons resident, or things situate, within the county. Our courts are creatures of positive law, and have such jurisdiction, both as to persons and things, as is conferred upon them by statute or by the Constitution of the State. The Court of Probate had such jurisdiction as the statute gave it, no more and no less. It did not inhere in the nature of the tribunal that its jurisdiction in the sale of infants' lands should be confined to such lands as were within the county. The extent of its jurisdiction, then, must depend upon the construction of the statutes which conferred its powers upon it. The difficulty of the question is, however, enhanced by the consideration that, as we have seen, the jurisdiction of that court to direct the sale of the lands of infants by their guardians is maintained only upon the ground that it was assumed in the first place and afterwards directly and indirectly sanctioned by the legislature, before its exercise in the instance under consideration. If we could turn to a statute expressly conferring it, our simple duty would be to construe that statute and thereby solve the inquiry.

By the act of 1824 (R. S. 1824, p. 314, sec. 1), jurisdiction was conferred upon the equity side of the circuit courts over matters concerning "the trusts, rights and interests arising from the relations of guardian and ward, * * in as full and ample a manner as is allowed said courts in other cases belonging peculiarly to their cognizance." The thirty-second section expressly authorized the court to "appoint guardians of minors, * * on application made or advice given." The next section required inventories of the

personal estate of wards, as was required in cases of administration, and gave the guardian power to sell such property. Then section thirty-four reads, "The circuit court, upon the application of any guardian, who may be appointed under the provisions of this act, praying for the sale of any real estate of his ward, * * shall decree the sale of such real estate, * * and after the confirmation of any sale by the court, as in case of sales made by executors or administrators, the conveyance shall be made." Executors and administrators, upon discovering the insufficiency of the personal estate to pay the debts of the deceased, were required to make an inventory of the real estate and have it appraised, and file the inventory in the circuit court (meaning, certainly, the court which appointed the executor or administrator), and then, upon suggestion, and summoning the heirs, the court (the same court, surely) would decree the sale of the whole, or so much as might be necessary; but the court was to approve the sale before a conveyance should be made (sec. 10).

The thirty-fifth section required an inventory and appraisement of the ward's real estate to be filed before a sale thereof should be decreed, and a bond with sureties conditioned that the guardian should faithfully apply the proceeds of sale under the direction of the court. The thirty-eighth section required executors, administrators, and guardians to deposit, from time to time, in the court from which their authority was derived, "all inventories, with the valuations, memoranda of sales, and other papers containing important transactions in the management of their trusts."

This evidently referred to inventories and sales of real estate, as well as of personal property.

It seems, in view of all these provisions taken together, that the circuit court which appointed the executor, administrator, or guardian, was the one to which application must be made for the sale of the real estate. Otherwise, these various requirements could not be performed. Now, the

jurisdiction over sales of real estate by guardians, which the Court of Probate, created the next year, undertook to exercise, was the precise jurisdiction which before, by the act of 1824, belonged to the circuit court. And this was the jurisdiction which the legislature, as has been shown, afterwards recognized as lawful and proper, and, by the act of 1829, authorized to be continued over "probate business" until the new Probate Court, then created, should be ready for business; and it was under that authority that the Court of Probate acted in decreeing this sale. By an examination of the session laws of the State prior to 1824, it will be seen that no settled policy had been adopted as to the territorial jurisdiction of courts over such sales, either by administrators or guardians. It is a mere question of policy and convenience, which at that day had not been very well defined. It is believed that prior to 1824 authority had not been conferred on any court, by statute, to direct the sale of the real estate of wards generally; it was confined to houses and lots in towns and villages; and the court of any county had jurisdiction to direct such sales of lots wherever situated in the State. Acts 1818, p. 148, sec. 34. And yet, by the same act (sec. 24),lands of decedents could only be sold by direction of the court of the county where the land was situated. By the act of 1825 (Acts, p. 56), if letters testamentary or of administration were taken in a county in which were lands of the decedent, the court granting the letters could order the sale of those lands or any other lands of the decedent within the State. By the act of 1827 (Acts 1827 p. 49), the court granting such letters could direct the sale of a land office certificate for lands in any other county; though by the act of 1818 (Acts 1818, p. 144), only the court of the county where the land was situate could do it. By the revised statutes of 1831 and 1838, only the court appointing an executor or administrator could direct the sale; though as to the sales by guardians, the matter was not made definite.

But we need not further multiply references to statutes.

It appears from those already made, that there was no settled policy which might afford aid in construing a statute silent as to the particular county in which the court should take the jurisdiction. It was only at a day comparatively recent that an action denominated, at common law, transitory, could not be brought in any county where the defendant might be found and served with process. *Wynn* v. *Kiser*, 7 Blackf. 299.

Where jurisdiction to order the sale of lands is given without limit express or implied as to territory, it is difficult to find a satisfactory reason for holding that its exercise shall be confined to lands within the county. Counties are created for the convenience of municipal government, and courts are organized within them that justice may be readily at hand. Where process is required and cannot go to the sheriff of another county, as is sometimes the case, the jurisdiction is limited, in consequence. But here no process was necessary. Upon the whole, the majority of the court (our brother ELLIOTT dissenting upon this point) are of opinion that the court in Knox had jurisdiction to direct the sale of the land in Allen. And we all agree that the doctrine of relation applies—that this treaty operated instantly, in law, as a grant, the subsequent location of the land merely ascertaining the specific thing which was granted.

6. The next question in order is, whether the Probate Court, upon its organization, had authority to take jurisdiction of matters then pending in the Court of Probate, and conduct them to a conclusion. We are of opinion that this question must be answered in the affirmative. There was no express enactment to that effect, but we think that the act of 1829 and the act of 1830, already referred to, imply that such was the legislative intention.

7. Though a bond was required by law to be given before entering the order of sale, yet the failure to require it was not an error rendering the proceeding void.

8. The approval of the President was not necessary to the validity of the guardian's deed of conveyance. The

treaty did not require it in such a case. That clause was intended as a protection against imposition practiced upon the grantee and his heirs. It is commonly found in Indian treaties of that day, but has never been held applicable to conveyances made under the direction of courts.

Judgment affirmed, with costs.

*L. M. Ninde, R. S. Taylor, W. H. Coombs*, and *W. H. H. Miller*, for appellants.

*J. L. Worden, J. Morris, W. H. Withers, D. D. Pratt*, and *R. Brackenridge*, for appellee.